# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs August 18, 2009

## STATE OF TENNESSEE v. DEONRAY J. FISK

Direct Appeal from the Circuit Court for Warren County
No. F-11077     Larry B. Stanley, Jr., Judge

No. M2007-02353-CCA-R3-CD - **Filed July 20, 2010**

Following a jury trial, Defendant, Deonray J. Fisk, was found guilty of three counts of attempted second degree murder, a Class B felony, three counts of aggravated assault, a Class C felony, and one count of unlawful possession of a handgun by a convicted felon, a Class E felony. The Trial Court sentenced Defendant as a Range I, standard offender, to eleven years for each attempted murder conviction, six years for each aggravated assault conviction, and two years for the weapons conviction. The trial court ordered Defendant to serve his sentences for attempted murder consecutively. The trial court ordered Defendant to serve his sentences for aggravated assault concurrently with each other and with Defendant's sentence for attempted second degree murder in count one of the indictment. The trial court ordered Defendant to serve his sentence for his weapons conviction consecutively with his conviction for attempted second degree murder in count one and concurrently with the other sentences for an effective sentence of thirty-five years. On appeal, Defendant argues that the trial court erred in determining the length and manner of service of his sentences. After a thorough review, we affirm the trial court's judgments. We conclude, however, that double jeopardy principles require that Defendant's aggravated assault convictions in counts 4, 5, and 6 of the indictment be merged with Defendant's convictions of attempted second degree murder in counts 1, 2, and 3, and we remand for the entry of corrected judgments consistent with this opinion. Defendant's effective sentence of thirty-five years remains unchanged.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Criminal Court Affirmed as Modified**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which DAVID H. WELLES, and ROBERT W. WEDEMEYER, JJ., joined.

Bud Sharp, McMinnville, Tennessee, for the appellant, Deonray J. Fisk.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; Thomas Miner, Assistant District Attorney General; and Jason Crain, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

David Marcindes, Aldon Estrada, and Jorge Baltista went to Wal-Mart on December 22, 2005, to shop for groceries. David Marcindes testified that as they were standing in the check-out line, Defendant, who was standing behind him, made a hand gesture and spoke "crazy pathos." None of the three men spoke to Defendant. The men left the store and placed the groceries in the back of Aldon Estrada's truck. Aldon Estrada and Mr. Baltista stated that they saw Defendant in the store's parking lot in a white vehicle with a temporary tag attached to the rear window. Aldon Estrada said that Defendant was sitting in the passenger side of the vehicle.

Aldon Estrada got into the driver's seat of the truck, Mr. Baltista got into the front passenger seat, and David Marcindes sat in a side seat in the cab with his back to the driver's side of the truck. The three men began to drive home on Highway 70E. Aldon Estrada saw in front of him the white vehicle with the temporary tag which he had previously seen in the Wal-Mart parking lot. Aldon Estrada pulled into the left lane and passed the vehicle. A short time later, the men heard a sharp noise and thought that the one of the truck's tires had burst. They then realized that the noise was a gunshot. The white vehicle began to pass the truck, and Alson Estrada saw flashes emanating from the muzzle of a gun. David Marcindes fell over in his seat with a gunshot wound to his back right hip. The white vehicle passed Aldon Estrada's truck, crossed over the grass median separating the four lanes of traffic, and began to drive back toward the truck. Aldon Estrada increased the speed of his vehicle and drove past the white car. The men drove to the White County Hospital so that Mr. Marcindes could receive treatment for his injury.

Photographs of Aldon Estrada's truck were introduced as an exhibit at trial. The photographs showed two bullet strikes in the side of the truck's bed, one bullet strike in the extended cab's panel behind which David Marcindes was sitting, and a fourth bullet strike in the bottom of the driver's side door.

Deputy John Ford with the White County Sheriff's Department, spoke with the victims' interpreter at the hospital and then contacted the Warren County Sheriff's Department. Deputy Ford searched Mr. Estrada's truck on December 22, 2005. He

recovered one projectile from the interior of the truck's cab and another projectile in the bed of the truck.

Nancy Milley testified that in December 2005 she lived in the Wayside Trailer Park in McMinnville. On December 27, 2005, Ms. Milley heard gunshots fired from the house next door. Ms. Milley looked out her window and saw Defendant standing on the back porch of the house. Ms. Milley called 911.

Kevin Murphy, a detective with the Warren County Sheriff's Department, drove to the location of the reported shooting on Lowry Lane next to the Wayside Trailer Park. Deputy Murphy saw Defendant standing on the back porch of the house. Deputy Murphy approached Defendant who invited him into the house. As he entered the house, Deputy Murphy noticed a 9 mm shell casing near the back steps. Defendant told Deputy Murphy that he had not recently discharged a gun and denied that he had a gun. Defendant told Deputy Murphy that the house belonged to Christy Fisk, his cousin's wife, and Defendant could not consent to a search of the house. The two men exited the house, and Defendant locked the back door. Deputy Murphy telephoned Ms. Fisk at her place of employment and asked her to return home.

Ms. Fisk testified that Defendant spent the night at her home on December 26, 2005, and was still there when Ms. Fisk left for work the next morning. Ms. Fisk said that Defendant was alone in the house that morning. When she arrived home in response to Deputy Murphy's telephone call, Ms. Fisk consented to a search of her home. Deputy Murphy searched Ms. Fisk's house and found a 9 mm Taurus pistol located on the top of one of the kitchen cabinets. Two more 9 mm shell casings were found in the back yard. Ms. Fisk stated that she did not own a gun, and she had never seen the gun found in her home.

Jim Hartman, an investigator with the Warren County Sheriff's Department, investigated the vicinity of the shooting on Highway 70E on December 22, 2005. With the aid of strobe lights, Investigator Hartman located a 9mm shell casing approximately one mile from the Highway 30 junction. Investigator Hartman left Deputy Phil Bollinbeck in charge of the investigation of the crime scene while he traveled to the hospital to interview the victims. The victims, through an interpreter, described the series of events leading up to the shooting. Mr. Estrada and Mr. Baltista gave Investigator Murphy the receipts for their purchases from Wal-Mart on December 22, 2007, with Mr. Estrada's receipt numbered 06068 and Mr. Baltista's receipt numbered 06069. Investigator Murphy later obtained receipt no. 06070 from a Wal-Mart employee showing that the person in line behind Mr. Estrada purchased socks, heat packs, and gloves.

Investigator Hartman participated in Defendant's interview at the District Attorney General's office in McMinnville on December 27, 2005. Defendant denied any involvement in the shooting, but he later acknowledged that he had spoken to the victims in the check-out line at Wal-Mart on December 22, 2005. After Defendant's interview, a vehicle matching the victims' description of the vehicle involved in the shooting was located on December 27, 2005, at the Rosewood Apartments. The temporary tag attached to the back window was registered in the name of Thomas Bonner, Defendant's father. A search of the vehicle revealed a white, plastic bag from Wal-Mart containing a pair of socks and a pair of Remington gloves. The prices listed on the items' tags matched the prices reflected on receipt no. 06070.

Linda Farley, an employee of Wal-Mart, testified that the store's receipts showed the store's assigned number and the number of the cash register generating the receipts. Ms. Farley stated that receipts are numbered sequentially so that receipt nos. 06068 and 06069 were generated before receipt no. 06070.

Thomas Bonner testified that he was scheduled for surgery on December 21, 2005. Mr. Bonner stated that he loaned Defendant his vehicle because he was not going to be able to drive for four or five days following the surgery. Mr. Bonner said that he did not remember which day Defendant took his vehicle. Mr. Bonner acknowledged that he told the investigating officers on December 27, 2005, that he loaned Defendant his vehicle on December 21, 2005.

Don Carmen testified that he is a special agent assigned to the Tennessee Bureau of Investigation's Crime Laboratory as a forensic scientist in the area of firearms identification. Special Agent Carmen stated that he tested the 9 mm Taurus pistol recovered from Ms. Fisk's house, and the three shell casings found in her back yard and determined that the three shell casings came from the Taurus pistol. Special Agent Carmen also compared the four cartridge casings found on Highway 70E and the bullet and bullet fragments recovered from Aldon Estrada's vehicle with the 9mm pistol found in Ms. Fisk's home and determined that the bullet and cartridge casings were fired from the 9 mm pistol. Special Agent Carmen stated, however, that "[t]he bullet fragments were in pieces, and it was very difficult to determine anything" but the fact that the fragments had the same rifling profile as the bullet.

The State rested its case-in-chief, and Defendant presented his defense. Shona Cozelle testified that she was operating the cash register on December 22, 2005, when the victims and Defendant made their purchases. Ms. Cozelle stated that she remembered the four men because employees were talking about the shooting the next morning. Ms. Cozell described the victims as "agitated." Ms. Cozelle did not notice any altercation between

Defendant and the victims. Ms. Cozelle said that Defendant was using his cell phone while he stood in line.

Chris Hollis testified that he was with Defendant on December 22, 2005, between 10:00 p.m. and midnight. Mr. Hollis said that he and Defendant went to Wal-Mart and then sat in the store's parking lot smoking marijuana. Mr. Hollis denied that they followed the victim's vehicle. Mr. Hollis said that he drove Defendant to Jamie Ivey's house around midnight and then went home.

James Russell Davis, II, a special agent assigned to the T.B.I.'s microanalysis section of the Crime Laboratory, testified that he analyzed a gunshot residue test taken from Defendant on December 27, 2005 during Defendant's interview with the investigating officers. Special Agent Davis stated that he did not find any evidence indicative of gunshot powder residue. Special Agent Davis said that generally residue will remain present on an individual's skin for approximately eight hours. On cross-examination, Special Agent Davis acknowledged that he did not personally know the length of time which had elapsed between the reported shooting and the performance of the test. Special Agent Davis also stated that gloves could prevent the accumulation of gunshot powder residue on the individual's hands.

Defendant testified that he lived in Murfreesboro in December 2005, and he returned to Warren County "a day or two before Christmas" to attend a funeral and spend the holidays with his family. Defendant said that he went to Wal-Mart on December 22, 2005, to purchase gloves, heat packs to put in the gloves, and insulated socks because the heater in his father's car was not working. Defendant remembered seeing the victims in front of him at the check-out line, but he said that he did not engage in any conversation with the three men. Defendant stated that he was on his cell phone the entire time that he stood in line and was still on his cell phone when he exited the store. Defendant said that he sat in the parking lot with Mr. Hollis and smoked marijuana. Defendant then drove to Whitaker Street to Ms. Ivey's house and got out of his vehicle. Defendant said that he let Mr. Hollis drive the vehicle away with the understanding that Mr. Hollis would pick Defendant up the next morning. Defendant stated that he did not leave Ms. Ivey's house until the next morning. Defendant said that he went to Ms. Fisk's home on December 26, 2005. After Ms. Fisk left for work the next morning, two of Defendant's friends stopped by the house. Defendant took a shower and when he returned to the living room, his friends were gone.

## II. Sentencing Hearing

Jennifer Craighead, a probation officer for the Tennessee Board of Probation and Parole, prepared Defendant's presentence report which was introduced as an exhibit at the sentencing hearing without objection. Ms. Craighead testified that Defendant submitted his

version of the incident during the preparation of the presentence report.  Defendant denied committing the offenses and wrote:

> [a]ll I ask is whatever time you give me that you understand your [sic] giving it to a man who's not guilty of the charge[.]   Yes I was at Wal-Mart and yes I was at the house [where] they found the gun[,] but I wasn't the only Black man at [Wal-Mart] with ta[t]toos on his neck and I wasn't the only person or persons at that house!!

Ms. Craighead said that Defendant entered a plea of guilty to robbery, a Class C felony, in 2001 and was sentenced to five years.  Ms. Craighead stated that Defendant was denied parole and served his entire sentence.  In 2006, while he was incarcerated on the current charges, Defendant entered a plea of guilty to possession of hydrocodone, a Class A misdemeanor, and was sentenced to eleven months, twenty-nine days.  Defendant reported that he began using marijuana at sixteen and "used about a quarter a day."  Defendant reported that he began using cocaine when he was twenty-one and used "a couple of grams" almost every day until he was incarcerated on the current charges.

On cross-examination, Ms. Craighead said that Defendant described his childhood as "confusing" because his parents were not involved in his life.  Defendant reported dropping out of high school in the eleventh grade.  Defendant said that playing sports during school was "a positive influence in his life," but he was unable to participate in the school's sports program after he injured his knee and ankle.

At the sentencing hearing, Defendant testified that he was removed from the custody of his parents when he was nine years old, and he remained in State custody until he was eighteen. Defendant stated that he tried to continue his high school education, but he did not follow through with enrollment in an adult high school program.  Defendant acknowledged that he voluntarily used drugs.  Defendant denied committing the charged offenses.

On cross-examination, Defendant acknowledged that he had received disciplinary write-ups while in prison for his robbery conviction, and had spent time in segregation for "interfering with an officer's duty."  Defendant acknowledged that the misdemeanor drug charge was incurred while he was incarcerated at the Warren County Jail on the current charges.  On redirect examination, Defendant explained that he had conflicts with the other inmates while he was incarcerated which led to the denial of parole.  Defendant said, "You've got to take up for yourself.  You got to defend yourself."

The trial court considered Defendant's previous history of criminal convictions as an enhancement factor in determining the length of Defendant's sentences for all of the

offenses. *See* T.C.A. § 40-35-114(1). The trial court considered Defendant's use of a gun to commit the attempted second degree murder offenses as an enhancement factor for these sentences. *See id*. § 40-35-114(9). Based on these considerations, and the presence of no mitigating factors, the trial court sentenced Defendant as a Range I, standard offender, to eleven years for each attempted second degree murder conviction, six years for each aggravated assault conviction, and two years for his weapons conviction.

The trial court found that an extended sentence was appropriate based on its finding that Defendant was a dangerous offender whose behavior indicated little or no regard for human life, and that Defendant had no hesitation about committing a crime in which the risk to human life was high. T.C.A.§ 40-35-115(4). The trial court found that the circumstances surrounding the commission of the offenses were "aggravated" and "atrocious." The trial court stated:

> [a]nd I hate it that he grew up that way. And I hate that [Defendant] has become what he is. But he's a dangerous man. I don't think its improper to grant an extensive sentence here because I think it relates directly to what happened. He was a prior felon. He committed the offense of robbery. Possessed a high-powered handgun. He attempted to kill people he didn't even know. And that is just extremely troubling to me.

Based on these findings, the trial court ordered Defendant to serve his attempted murder sentences in counts 1, 2, and 3 of the indictment consecutively. The trial court ordered Defendant to serve his aggravated assault sentences in counts 4, 5, and 6 concurrently with each other and with count 1. The trial court ordered Defendant to serve his sentence for unlawful possession of a weapon consecutively to count 1 and concurrently with the other sentences, for an effective sentence of thirty-five years.

## III.  Untimely Notice of Appeal

Before we determine the merits of the case, we must determine whether to hear Defendant's untimely appeal. The trial court entered its judgments of conviction on October 8, 2007, and Defendant untimely filed his motion for new trial on March 11, 2008. *See* Tenn. R. Crim. P. 33(b) (providing that "[a] motion for a new trial shall be in writing . . . within thirty days of the date the order of sentence is entered"). The trial court denied Defendant's motion on August 26, 2008. However, the trial court had no power to hear Defendant's untimely motion for a new trial, and the order issued denying a new trial was a nullity. *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997); *State v. Stephens*, 264 S.W.3d 719, 728 (Tenn. Crim. App. 2007).

Defendant's notice of appeal was untimely filed because the untimely motion for a new trial did not toll the thirty-day filing period for a notice of appeal. *See* Tenn. R. App. P. 4(c). The thirty-day period specified in Rule 4(a) of the Tennessee Rules of Appellate Procedure for filing a timely notice of appeal began to run on October 8, 2007, when the trial court entered Defendant's judgments of conviction, and the period ended on November 7, 2007. Tenn. R. App. P. 4(a). If a motion for new trial is not timely filed following a jury trial, all issues predicated upon error as a result of "action committed or occurring during the trial of the case, or other ground upon which a new trial is sought" are waived. Tenn. R. App. P. 3(e).

Unlike the untimely filing of Defendant's motion for new trial, however, this Court does have authority to waive the untimely filing of Defendant's notice of appeal "in the interest of justice." Because Defendant raises only sentencing issues on appeal, we elect, in the interest of justice, to waive the untimely filing of the notice of appeal and review the issues on the merits.

## IV. Merger of Offenses

Prior to imposing sentencing, the trial court noted that it intended to merge Defendant's convictions for aggravated assault with his convictions for attempted second degree murder. However, an order to this effect is not reflected on the judgment forms. The State on appeal concedes that the aggravated assault convictions and attempted second degree murder convictions should merge, and we agree.

The indictment charged Defendant with committing attempted second degree murder and aggravated assault in counts 1 and 4 against David Estrada, in counts 2 and 5 against Aldon Estrada, and in counts 3 and 6 against Jorge Baltista. In *State v. Hall*, 947 S.W.2d 181, 184 (Tenn. Crim. App. 1997), this Court concluded that a defendant's convictions of attempted second degree murder and aggravated assault arising out of a single attack upon a single victim violates principles of double jeopardy under Tennessee's Constitution. *See generally State v. Denton*, 938 S.W.2d 373 (Tenn. 1996). As was the case in *Hall*, Defendant's convictions in counts one and four, counts two and five, and counts three and six arose out of a single attack upon a single victim, and the same evidence was relied upon to prove both the attempted second degree murder offense and aggravated assault offense as to each victim. We therefore set aside the convictions for aggravated assault and remand this case to the trial court for entry of corrected judgments to reflect the merger of Defendant's convictions for aggravated assault into his convictions for attempted second degree murder as to each victim.

## V. Length and Manner of Service of Sentence

Defendant argues that the trial court erred in determining the length of his sentences and in imposing consecutive sentencing. On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is improper. *See* T.C.A. § 40-35-401, Sentencing Comm'n Comments; *see also State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. T.C.A. § 40-35-401(d). This presumption of correctness, however, "'is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances.'" *State v. Carter*, 254 S.W.3d 335, 344-45 (Tenn. 2008) (quoting *State v. Ashby*, 823 S.W.2d 166, 169 Tenn. 1991)). "If, however, the trial court applies inappropriate mitigating and/or enhancement factors or otherwise fails to follow the Sentencing Act, the presumption of correctness fails," and our review is de novo. *Carter*, 254 S.W.3d at 345 (quoting *State v. Shelton*, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992); *State v. Pierce*, 138 S.W.3d 820, 827 (Tenn. 2004)).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id*.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also Carter*, 254 S.W.3d at 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

## A. Length of Sentence

Defendant argues that the lengths of his sentences are excessive and inconsistent with the principles of sentencing. Defendant submits that the trial court erred in not considering his difficult childhood and his drug use as mitigating factors. Defendant also contends that

he does not have the type of criminal history which would support the imposition of a maximum sentence and argues that his short criminal history would indicate his potential for rehabilitation or treatment. Defendant argues that the length of his sentences are not reasonably related to the seriousness of the offense which consisted of "one incident committed in the space of two or three seconds."

As a Range I, standard offender, Defendant is subject to a sentence of between eight and twelve years for each attempted second degree murder conviction, a sentence of between three and six years for each aggravated assault conviction, and a sentence of between one and two years for his conviction of unlawful possession of a weapon by a convicted felon. T.C.A. § 40-35-112(a)(2) and (5). In determining the length of Defendant's sentences, the trial court considered the circumstances of the offenses, Defendant's prior criminal history and drug use, and his social and family history. The trial court observed, "And [defense counsel], don't get me wrong. I do have sympathy for someone like [Defendant] who is probably not given the advantages that many people are in life, and did have a rough upbringing." The trial court, however, found that Defendant's conduct was "simply unjustified and scary." The trial court found it "very troubling" that Defendant used a deadly weapon to commit the attempted second degree murder offenses and that he discharged his weapon in an attempt "to kill people he didn't even know." The trial court placed significant weight on Defendant's prior robbery conviction and the fact that he incurred a new conviction of simple possession of drugs while incarcerated on the current charges.

In *State v. Carter*, the Tennessee Supreme Court clarified the 2005 changes in Tennessee sentencing law and stated:

> [A] trial court's weighing of various mitigating and enhancement factors has been left to the trial court's sound discretion. Since the Sentencing Act has been revised to render these factors merely advisory, that discretion has been broadened. Thus, even if a trial court recognizes and enunciates several applicable enhancement factors, it does not abuse its discretion if it does not increase the sentence beyond the minimum on the basis of those factors. Similarly, if the trial court recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors. The appellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence.

*Carter*, 254 S.W.3d at 345-46.

The record clearly shows that the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. Based on our review, we conclude that the enhancement factors considered by the trial court adequately support the trial court's discretionary decision to impose a sentence of eleven years for each attempted second degree murder conviction, six years for each aggravated assault conviction, and two years for his weapons conviction. Defendant is not entitled to relief on this issue.

### B. Consecutive Sentencing

Defendant does not challenge the trial court's finding that he is a dangerous offender for sentencing purposes. Defendant argues, however, that this factor, by itself, is insufficient to support the imposition of consecutive sentences. Defendant also submits that his effective sentence of thirty-five years is grossly disproportionate to the sentences imposed for similar crimes in other jurisdictions and thus constitutes cruel and unusual punishment.

The Sentencing Act was passed to "[a]ssure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentences." T.C.A. § 40-35-102(2). However, "differences in sentences are appropriate where they relate to differences in the offender or in culpability." *State v. Clint Ray McCoy*, No. W2002-01017-CCA-R3-CD, 2003 WL 21339285, at *3 (Tenn. Crim. App., at Jackson, May 23, 2003), *no perm. to appeal filed* (citing *State v. Moss*, 727 S.W.2d 229, 235 (Tenn. 1986)). "The policy expressed [in the Sentencing Act] is that the punishment imposed should fit the crime as well as the offender." *Moss*, 727 S.W.2d at 235.

Our supreme court has concluded that Article I, Section 16 of the Tennessee Constitution prohibiting the infliction of cruel and unusual punishments mandates a proportionality inquiry even in noncapital cases. *State v. Harris*, 844 S.W.2d 601, 602 (Tenn. 1992). The *Harris* court adopted the following proportionality analysis for noncapital cases:

> [T]he sentence is initially compared with the crime committed. Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends – the sentence is constitutional. In those rare cases where this inference does arise, the analysis proceeds by comparing (1) the sentences imposed on other criminals in the same jurisdiction, and (2) the sentences imposed for commission of the same crime in other jurisdictions.

*Id*. at 603. However, "because reviewing courts should grant substantial deference to the broad authority legislatures possess in determining punishments for particular crimes, '[o]utside the context of capital punishment, *successful* challenges to the proportionality of

particular sentences [will be] exceedingly rare.'" *Id*. at 602 (quoting *Solem v. Helm*, 463 U.S. 277, 289-90, 103 S. Ct. 3001, 3009 (1983) (emphasis in original) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272, 100 S. Ct. 1133, 1138 (1980)); *see also State v. Smith*, 48 S.W.3d 159, 172 (Tenn. Crim. App. 2000).

"Determining whether a penalty for a particular offense raises an inference of gross disproportionality entails a comparison between the gravity of the offense and the harshness of the penalty." *Smith*, 48 S.W.3d at 172 (quoting *Solem*, 463 U.S. at 290-291, 103 S. Ct. at 3010). Factors to consider "include (1) the nature of the crime, including whether society views the crime as serious or relatively minor and whether the crime is violent or non-violent; (2) the circumstances of the crime, including the culpability of the offender, as reflected by his intent and motive, and the magnitude of the crime; and (3) the existence and nature of any prior felonies if used to enhance the defendant's penalty." *Id*. (citing *Solem*, 463 U.S. at 291-297, 103 S. Ct. at 3010-3013).

In the instant case, the offenses committed against the victims were both serious and violent. Defendant discharged his weapon multiple times from a moving vehicle at another moving vehicle while driving on a public highway, placing three people at risk of death. Defendant's vehicle then crossed over the median of the four-lane highway and turned around to approach the victims' vehicle again. Defendant did not know the victims or have any prior relationship with them. The victims simply had the misfortune of standing in front of Defendant in the check-out line and then passing Defendant's vehicle on their way home. In determining the manner of service of Defendant's sentences, the trial court considered the circumstances of the offenses, Defendant's prior conviction of robbery, his difficulty in complying with prison regulations while incarcerated on his robbery conviction, his continuing criminal behavior while incarcerated on the current charges, and his denial of any responsibility for his conduct. T.C.A. § 40-35-115(b)(4). Based on these factors, the record supports the trial court's finding that Defendant is a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime when the risk to human life is high." We further conclude that the record supports the trial court's finding that an extended sentence is "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved" under the circumstances. *State v. Wilkerson*, 905 S.W.2d 933, 939 (Tenn. 1995). A "dangerous offender" is one classification of offenders "considered by the legislature to be deserving of an extended sentence." *Id*. at 936. Only one factor is needed for the trial court to act within its discretion to impose consecutive sentences. *See* T.C.A. § 40-35-102(2).

Based upon our review, we conclude that there is no inference of gross disproportionality under the facts presented in this case. Accordingly, we need not proceed with a jurisdictional analysis. Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we remand for entry of corrected judgments to reflect the merger of Defendant's convictions for aggravated assault in counts 4, 5, and 6 of the indictment with his convictions of attempted second degree murder in counts 1, 2, and 3. In all other aspects we affirm the judgment of the trial court.

_____

THOMAS T. WOODALL, JUDGE